SCOTT, DOUGLASS &
McCONNICO, L.L.P.
James D. Baskin
California State Bar No. 81542
jbaskin@scottdoug.com
Casey L. Dobson
cdobson@scottdoug.com
S. Abraham Kuczaj, III
akuczaj@scottdoug.com
John W. Gasink
jgasink@scottdoug.com
600 Congress Avenue, Suite 1500
Austin, Texas 78701-2589
(512) 495-6300 Tel.
(512) 474-0731 Fax
ATTORNEYS FOR PLAINTIFF
[ADDITIONAL ATTORNEYS APPEAR
ON SIGNATURE PAGE]



ORIGINAL

FILED
CLERK, U.S. DISTRICT COURT

MAY 17 2013

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re COUNTRYWIDE FINANCIAL CORP. MORTGAGE-BACKED SECURITIES LITIGATION CASES | Case No. 11-MDL-02265-MRP (MANx)<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |
| ROYAL PARK INVESTMENTS SA/NV,<br><br>              Plaintiff,<br><br>       v.<br><br>BANK OF AMERICA CORP.,<br>NB HOLDINGS CORP.,<br>COUNTRYWIDE FINANCIAL CORP.,<br>COUNTRYWIDE SECURITIES | Case No. 2:13CV3294 MRP (MANx) |

1 | CORP., COUNTRYWIDE HOME
2 | LOANS, INC., BAC HOME LOANS
SERVICING LP f/k/a COUNTRYWIDE
3 | HOME LOANS SERVICING, LP,
4 | CWALT, INC., and CWABS, INC.,
Defendants.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.     SUMMARY OF THE ACTION ...................................................................... 8

II.    PARTIES ...................................................................................................... 17

       A.     Plaintiff ............................................................................................ 17

       B.     Countrywide Defendants ................................................................. 21

       C.     Bank of America Defendants ........................................................... 26

III.   JURISDICTION AND VENUE ................................................................... 28

IV.    BACKGROUND ......................................................................................... 30

       A.     The Shift in the Mortgage Lending Industry from "Originate to
              Hold" to "Originate to Distribute" .................................................. 30

              1.     The Traditional Practice of "Originate to Hold" ..................... 30

              2.     The Massive Shift to "Originate to Distribute" ...................... 32

       B.     Countrywide Engaged in Every Stage of the Securitization
              Process ............................................................................................. 36

V.     FACTS RELEVANT TO PLAINTIFF'S CLAIMS ..................................... 43

       A.     Countrywide's Material Misrepresentations and Omissions ............ 43

              1.     Countrywide Misrepresented Its Stated Underwriting
                     Guidelines ............................................................................. 43

                     a.     Countrywide Touted "Prudent Underwriting
                            Standards" and Pledged "No Compromise" in
                            Adhering to Them ......................................................... 43

                     b.     Countrywide Defendants Abandoned Stated
                            Underwriting Guidelines in Favor of "Matching"
                            or "Shadow" Guidelines ............................................... 50

                     c.     Countrywide Defendants Adopted "Saleability" as
                            Sole Criteria for Loan Approval ................................... 56

                     d.     The Countrywide Defendants Ignored Repeated
                            Warnings about the Abuse of Exceptions from
                            Their Own Risk Management Officers ............................ 61

2.  Countrywide Failed to Disclose that its Exotic Loan Products, Including Allegedly "Prime" Pay-Option ARMs Were Likely to Suffer Significant Defaults and Deficiencies Because of Inadequate Underwriting ................. 71

3.  Countrywide Abused the Appraisal Process and Misrepresented Loan-to-Value Ratios ..................................... 79

     a.  Plaintiff's Statistical Analysis Confirms that the Countrywide Defendants Made Material Misrepresentations about the Mortgage Loan Pools ..... 90

4.  Countrywide Manipulated and Misrepresented Credit Ratings ........................................................................ 97

5.  Countrywide Cherry-Picked the Best Loans for Itself and Pooled the Rest for Sale to Investors like Plaintiff ............... 105

6.  Misrepresentations Regarding Transfer of Title .................... 109

B.  Plaintiff's Assignors Relied on the Countrywide Defendants' Misrepresentations When Investing in the Certificates ................... 116

C.  Countrywide Knew its Material Misrepresentations and Omissions Were False and Misleading ............................................. 130

1.  The Representations and Omissions Regarding Underwriting Guidelines Were False and Misleading .......... 138

2.  The Representations and Omissions Regarding LTV Ratios and Appraisals Were False and Misleading ............... 142

3.  The Representations and Omissions Regarding the Accuracy of then Credit Ratings Were False and Misleading .................................................................. 144

4.  The Representations and Omissions Regarding the Transfer of Good Title to the Mortgage Loans Were False and Misleading ............................................................. 146

D.  Plaintiff Suffered Losses as a Result of Defendants' Misrepresentations and Omissions ................................................... 148

VI.  BANK OF AMERICA DEFENDANTS' SUCCESSOR LIABILITY ...... 152

A.  The Bank of America Defendants are Liable for Countrywide's Acts and Omissions ........................................................................ 152

- 4 -

B.    The Bank of America Defendants are Liable Based on Actual Fraudulent Transfer .................................................................. 157

C.    The Bank of America Defendants are Liable Based on Constructive Fraudulent Transfer ................................................ 168

    1.    The Elements of a Constructive Fraudulent Transfer ............ 168

    2.    The Asset-Extracting Transactions Lacked Fair Consideration .................................................................... 169

    3.    The Sale Process Was Inherently Flawed By The Bank of America Defendants' Presence on Both Sides of Each Transaction ................................................................... 169

    4.    Neither Countrywide Nor the Bank of America Defendants Acted in Good Faith During the Asset-Extracting Transactions ................................................... 170

    5.    The Bank of America Defendants Obtained Countrywide's Valuable Customer Relationships and Other Intangible Assets Without Paying for Them ............... 170

    6.    The Asset-Extracting Transactions Rendered Countrywide Insolvent ..................................................... 173

    7.    The Asset-Extracting Transactions Left Countrywide With Insufficient Assets To Conduct Any Business Operations ..................................................................... 176

D.    The Bank of America Defendants' Actions Demonstrate That a De Facto Merger Occurred .................................................... 176

    1.    The Elements of De Facto Merger ....................................... 178

    2.    The Asset Transfers Did Not Comply with Governing State Law .............................................................. 180

    3.    Creditors Were Injured by the Failure to Comply with Such Law .............................................................. 184

    4.    The Asset Transfers Were Made for Inadequate Consideration .................................................................... 186

    5.    The Asset Transfers Were Designed to Disadvantage Creditors. .................................................................... 188

VII.   BANK OF AMERICA IS LIABLE UNDER THREE DISTINCT AND SEPARATE LEGAL THEORIES ...................................................... 190

VIII.  CAUSES OF ACTION ......................................................... 191

PRAYER FOR RELIEF ....................................................... 221

JURY DEMAND ............................................................ 221

DECLARATION OF SERVICE................................................ 223

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

991940

COMPLAINT
CASE NO. 2:13-CV-3294 MRP (MANx)

Plaintiff Royal Park Investments SA/NV ("Plaintiff"), by its undersigned attorneys, for its complaint herein against defendants Bank of America Corp., NB Holdings Corp., Countrywide Financial Corp., Countrywide Home Loans, Inc., CWABS, Inc., BAC Home Loans Servicing LP f/k/a Countrywide Home Loans Servicing LP, CWALT Inc., and Countrywide Securities Corp. (collectively, "Defendants"), alleges based upon personal knowledge as to Plaintiff's own actions and upon information and belief as to all other matters.   Plaintiff's information and belief is based upon the investigation of Plaintiff's counsel, which included review, analysis, and examination of the offering documents for the Certificates at issue; SEC filings and public statements by the Defendants; congressional testimony and related materials; media reports; documents governing the activities of the relevant actors; and court filings, along with discussions with state and federal agencies and attorneys for private litigants who have investigated and pursued actions against Defendants for misconduct relating to Certificates similar to those at issue herein during the relevant time period. Other facts relating to Plaintiff's allegations are known only to Defendants or are peculiarly within their custody or control, and will be developed after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1.      This case arises from a massive fraud perpetrated by Defendant Countrywide Financial Corporation and certain of its affiliates against the Plaintiff, whose assignors invested $80 million in mortgage-backed securities known as "certificates" issued, as part of the fraudulent scheme, by Countrywide's subsidiaries.[1]  Countrywide and its subsidiaries used U.S. Securities and Exchange Commission ("SEC") forms, such as registration statements, prospectuses and prospectus supplements both in draft and final form, as well as other documents such as draft and/or final versions of pitch books, term sheets, offering memoranda and electronic summaries of such materials, to sell the certificates to Plaintiff (collectively, the "Offering Documents").

2.      In reliance on the Offering Documents and other public statements by the Countrywide Defendants regarding their purportedly conservative underwriting standards, careful credit analysis and other material facts, Plaintiff's assignors purchased the certificates at issue herein (collectively, the "Certificates").  Plaintiff brings this action to recover, under New York common law, damages resulting from Defendants' misrepresentations, omissions, and/or fraud as set forth below.

---

[1]  Countrywide Financial Corp., Countrywide Home Loans, Inc., CWABS, Inc., BAC Home Loans Servicing, LP f/k/a Countrywide Home Loans Servicing, LP, CWALT, Inc., and Countrywide Securities Corp. are collectively referred to herein as the "Countrywide Defendants."

3.     The Countrywide Defendants' Offering Documents and other public statements not only misrepresented the supposedly strict underwriting guidelines that governed the approval of the mortgages backing the Certificates, they misrepresented and concealed the actual credit quality of those mortgages with false quantitative data about those loans.  Among other things, in the Offering Documents and other public statements, the Countrywide Defendants represented that (i) the loans backing the Certificates were written pursuant to the Countrywide Defendants' specific loan origination guidelines; (ii)  the prospective borrower's credit and ability to repay were evaluated before any loan approval; (iii) any exception to the stated underwriting guidelines was made on a "case-by-case basis," and/or only if the exception was justified by "compensating factors"; (iv)  almost every mortgaged property received an independent appraisal which conformed to acceptable standards; (v) loans were selected for securitization "in a manner [not] intended to affect the interests of the certificateholders adversely"; (vi) the ratings assigned to the Certificates accurately reflected their credit quality; and (vii) the Certificates were backed by good title to the underlying mortgage loans.  Each of these material representations was false when made, and the Countrywide Defendants made the representations knowingly or with reckless disregard to their falsity.  Plaintiff's assignors relied on these representations and suffered loss as a result.

4.      In reality, the Countrywide Defendants had systematically abandoned the underwriting guidelines described in the Offering Documents and other public statements.  They effectively replaced their touted underwriting standards with an undisclosed strategy to generate market share and profits by originating and securitizing as many mortgage loans as possible—no matter how shoddy those loans.  This strategy allowed the Countrywide Defendants to profit handsomely while shifting risk to unsuspecting investors, including Plaintiff's assignors, who relied on the critical but false information provided with respect to the Certificates.

5.      The Certificates were marketed in part by use of ratings assigned by various credit rating agencies.  The structure of each offering determined how the cash flows from the mortgage loans would be distributed, and purported to provide certain levels of protection in order to justify the rating assigned to the Certificate. The higher the ratings, the more quickly and more profitably the Certificates could be sold, and therefore securing investment grade ratings was critically important to perpetuate the Countrywide Defendants' scheme.  In fact, the Certificates could not have been issued at all, and certainly not issued under the expedited shelf registration process employed by the Countrywide Defendants, unless the specified investment grade ratings were obtained.   Consequently, the Countrywide Defendants engineered inflated credit ratings by providing the credit rating agencies with the false credit metrics set forth in the Offering Documents, and by

exercising their substantial economic power to engage in a competitive selection process known as "ratings shopping." Through these actions, the Countrywide Defendants were able to obtain higher ratings for the Certificates than were justified, and then knowingly or recklessly used those unjustified ratings to market the Certificates to unsuspecting investors, including Plaintiff and Plaintiff's assignors.

6. The misrepresentations above directly related to the value of the Certificates. The Countrywide Defendants were acutely aware that the value investors such as Plaintiff associated with the Certificates depended on the credit quality of the underlying loans. Consequently, the Countrywide Defendants represented that the loans underlying the Certificates had specific quantitative, risk-related metrics. These included, among other things, specific loan-to-value ("LTV") ratios and combined loan-to-value ("CLTV") ratios. In the Offering Documents for each of the Certificates at issue, the Countrywide Defendants misrepresented such material credit metric information, which goes to the heart of the risks associated with the mortgages backing the Certificates and thus the value of the Certificates themselves.

7. Plaintiff has conducted a statistical review of certain material quantitative metrics for the loan pools underlying the Certificates, and the results reveal the broad scope of the Countrywide Defendants' fraudulent scheme. While

the actual underlying loan files are uniquely within Defendants' control, Plaintiff has analyzed publicly available records and analyzed a statistically significant sample from each transaction.   First, despite representing in the Offering Documents for every RMBS that not a single underlying mortgage had an LTV ratio greater than 100%, the Plaintiff's analysis shows that 17.6% of them had LTV ratios above 100%.   That means from the date of origination, these loans exceeded the value of the mortgaged property.   Second, the Plaintiff's data analysis also shows that, for every RMBS, the Countrywide Defendants meaningfully understated the percentage of loans with an LTV ratio above 80%.

8.     The Countrywide Defendants also represented in the Offering Documents for every RMBS that the trustee for the Certificates would receive good title to the properties securing the underlying loans, but failed to ensure that such title was properly transferred and that the loans were properly assigned, increasing the losses suffered by Plaintiff.   Plaintiff's data analysis indicates that the Countrywide Defendants failed to properly assign an astounding 49.3% of the sampled loans.

9.     Plaintiff's forensic analysis shows, on a quantitative level, the systemic, massive fraud underlying the Countrywide Defendants' scheme.   There are a host of additional key factors that can only be examined once the actual loan files are produced, including but not limited to the "compensating factors"

considered on a "case-by-case" basis when the Countrywide Defendants approved exceptions to the stated underwriting guidelines.   The loan files are in the possession of Defendants and will only be available for examination by Plaintiff once discovery commences.   However, statements from the Countrywide Defendants' own senior officers and other insiders suggest that the loan files will provide even more evidence of the knowing, reckless, systemic abandonment of the stated underwriting guidelines.

10.   For example, the Countrywide Defendants' own senior officers and internal reports admitted that Countrywide's goal was to dominate the market and increase market share without regard to the stated underwriting guidelines.   Angelo Mozilo, co-founder and, at all relevant times, CEO of Countrywide Financial, stated during a July 2003 conference call with industry analysts that Countrywide Financial's goal was to "dominate" the mortgage market and "to get our overall market share to the ultimate thirty percent by 2006, 2007."   That goal was well known within Countrywide and permeated the Countrywide Defendants' actions as set forth herein.   In fact, in a November 2007 internal report, the Countrywide Defendants admitted "[w]e were driven by market share, and wouldn't say 'no' (to guideline expansion). … Market share, size and dominance were driving themes. …"

11.    The drive for market share eclipsed any internal compunction to adhere to the stated underwriting standards.   As a former senior regional vice president told *Business Week*, Countrywide "approached making loans like making widgets, focusing on cost to produce and not risk or compliance.  Programs like 'Fast and Easy' where the income and assets were stated, not verified, were open to abuse and misuse.  The fiduciary responsibility of making sure whether the loan should truly be done was not as important as getting the deal done."   In fact, despite publicly trumpeting adherence to the stated underwriting guidelines, senior officers of the Countrywide Defendants internally admitted that the controlling factor as to whether a loan would be approved was not whether it complied with underwriting standards.   Rather, what controlled was whether the loan could be sold in the secondary market.   In an internal email dated February 13, 2005 and subsequently produced to the SEC, David Sambol, Countrywide Home Loan's President and Chief Operating Officer, explained this strategy, stating "we should be willing to price virtually any loan that we reasonably believe we can sell/securitize without losing money, even if other lenders can't or won't do the deal."

12.    In furtherance of focusing on "saleability" rather than the stated underwriting guidelines to determine whether a loan should be approved, the Countrywide Defendants implemented a strategy in which Countrywide willingly

adopted the lending practices of its competitors, no matter how risky. In effect, the Countrywide Defendants punched the gas as they "race[d] to the bottom" in a frenzied effort to drive up profits. Countrywide's Chief Risk Officer John McMurray acknowledged that this "matching strategy" effectively "ced[ed] our credit policy to the most aggressive players in the market," something he admitted, when testifying to the SEC, was a "pretty serious concern." In addition to the matching strategy, the Countrywide Defendants offered loan products that Mozilo himself recognized as "toxic" or "poison."

13.     In short, the Countrywide Defendants' stated underwriting guidelines were systematically and surreptitiously abandoned, and senior management knew it. In mid-2005, Chief Risk Officer McMurray warned Sambol that "[a]s a consequence of [Countrywide's] strategy to have the widest product line in the industry, we are clearly out on the 'frontier' in many areas," further warning in a May 22, 2005 email that the frontier had "high expected default rates and losses." In the same email, McMurray cautioned Sambol that the Countrywide Defendants were approving loans based on exceptions to the stated underwriting guidelines "generally done even more aggressive than our guidelines," and that "[g]iven the expansion in guidelines and the growing likelihood that the real estate market will cool, this seems like an appropriate juncture to revisit our approach to exceptions."

14.     McMurray further warned Sambol that the Countrywide Defendants' failure to adhere to the stated underwriting guidelines and other misrepresentations could result in liability to investors, predicting that "we will see higher rates of default on the riskier transactions and third parties coming back to us seeking a repurchase or indemnification" based on those misrepresentations.

15.     Despite McMurray's warnings, the Countrywide Defendants' liberal exception practice continued unabated.  Frank Aguilera, a Managing Director responsible for Countrywide's risk management, reported in an internal email that a June 12, 2006 internal review showed that over 23% of the subprime loans generated by Countrywide at the time were approved as exceptions, even "taking into account all guidelines, published or not published, approved or not yet approved."   Aguilera wrote at the time that this "particularly alarming" report showed Countrywide's "inability to adequately impose and monitor controls on production operations."   Even Mozilo observed, in an April 13, 2006 internal email, that there was a broad "disregard for process [and] compliance with guidelines."

16.     The facts above summarize Defendants' misconduct, and are discussed more fully below.  In short, the Countrywide Defendants made material misrepresentations about the loans underlying the Certificates and the Certificates themselves.  Plaintiff's assignors reasonably relied on those misrepresentations,

including but not limited to material misrepresentations about the underlying loan characteristics, underwriting guidelines, credit ratings, and transfer of title when purchasing the Certificates. As a result of Defendants' misconduct, Plaintiff's assignors and Plaintiff suffered tens of millions of dollars in damages.

## PARTIES

A. **Plaintiff**

17.     Plaintiff Royal Park Investments SA/NV ("RPI"), is a limited liability company incorporated under the laws of Belgium, with its principal place of business at Rue Van Orleystraat 15, 1000 Brussels, Belgium. RPI was created by the Belgian State, Ageas (formerly known as Fortis Holding SA/NV), and BNP Paribas for the purpose of acquiring and managing a portion of Fortis Bank SA/NV's ("Fortis Bank") structured credit portfolio. The special purpose and mission statement of RPI is to minimize the downside risk and maximize recoveries on the legacy portfolio.

18.     RPI's creation was necessitated by the significant decline in the value of the Certificates (as well as other structured credit holdings) held by Fortis Bank, which threatened to destroy Fortis Bank and jeopardize the Belgian banking system. As such, the Belgian State intervened to stabilize Fortis Bank. As part of that intervention, the Belgian State bought Fortis Bank and then brokered a sale of 75% of Fortis Bank to BNP Paribas. It was a condition of the sale that BNP

Paribas would not be exposed to certain assets—including the Certificates—within Fortis Bank's structured credit portfolio.   As such, BNP Paribas hand-picked certain assets from Fortis Bank's structured credit portfolio.   Those hand-picked assets became the RPI portfolio, and those assets—along with all claim rights relating to those assets and the underlying transactions—were transferred to RPI. BNP Paribas and the Belgian State negotiated the deal and fixed the price of those assets at a price that was significantly less than what Fortis Bank (and its various subsidiaries, as described below) had paid for those assets.   In addition, RPI paid significantly more than the value of those securities on the date that they were transferred to RPI.   This inflated sale price to RPI, brokered by the Belgian State, was a condition of BNP Paribas' acquisition of 75% of Fortis Bank.

19.   RPI brings its claims against defendants as an assignee of causes of action regarding securities that were initially purchased by Fortis Bank and Scaldis Capital Limited, a conduit special purpose vehicle created, controlled, sponsored and supported by Fortis Bank.   The two original purchasers of the securities at issue herein are identified below.

(a)   Fortis Bank is a Belgian limited liability company with its registered office at Montagne du Parc 3, 1000 Brussels, Belgium, and its principal place of business in Brussels, Belgium.   Fortis Bank was the banking arm of Fortis Holding SA/NV ("Fortis Holding"), a Belgian insurance, banking and

investment management company.  In 2008, Fortis Holding sold Fortis Bank to the Belgian State, which then sold 75% of Fortis Bank to BNP Paribas.  Fortis Bank is now a subsidiary of BNP Paribas.  During the relevant time period, Fortis Bank purchased the following securities, which were subsequently assigned to RPI, along with all rights, title, and interest in such securities, including all causes of action. RPI retains to this day the claim rights on the following security:

**TABLE 1**

| CUSIP | Security | Class | Nominal (Par) Value | Purchase Date |
|-------|----------|-------|---------------------|---------------|
| 12668PAE2 | CWALT 2006-OA17 | 1A2A | $30,000,000.00 | 9/29/2006[2] |

(b)      Scaldis Capital Limited ("Scaldis") is a conduit special purpose vehicle created, along with co-issuer Scaldis Capital LLC, for placement of commercial paper in both the United States and European markets.  Scaldis was created, fully controlled, sponsored, and supported by Fortis Bank.  All of Scaldis' assets, including the securities at issue herein, were consolidated into the balance sheet of Fortis Bank prior to the time of the assignment to RPI, and all losses on the securities were incurred by Fortis Bank.  As the sponsor of Scaldis, Fortis Bank provided both credit and liquidity support for Scaldis and managed all its operations.  All decisions to purchase the securities at issue herein were made on behalf of Scaldis in Belgium by employees of Fortis Bank.  During the relevant

---

[2] Plaintiff's Summons with Notice contained a typographical error which listed the purchase date as 2/29/2006. The actual purchase date was 9/29/2006.

time period, Scaldis purchased the following securities, which were subsequently assigned to RPI, along with all rights, title, and interest in such securities, including all causes of action. RPI retains to this day the claim rights on the following securities:

**TABLE 2**

| CUSIP | Security | Class | Nominal (Par) Value | Purchase Date |
|-------|----------|-------|---------------------|---------------|
| 23243WAC2 | CWL 2006-18 | 2A2 | $20,000,000.00 | 9/28/2006 |
| 23243WAD0 | CWL 2006-18 | 2A3 | $30,000,000.00 | 9/28/2006 |

20.   Fortis Bank and Scaldis are referred to collectively herein as the "assigning entities" or the "assignors."

21.   RPI acquired the legal claims at issue in this case in exchange for good and valuable consideration.  The certificates at issue in this case were severely damaged on or before the day they were transferred to RPI, and continue to be damaged, in an amount to be proven at trial.  Evidence of such damages continues to mount as the Certificates at issue in this case continue to realize loan defaults, writedowns and losses.  RPI has standing to sue defendants to recover those damages as an assignee of claims regarding securities initially purchased by the above-identified two assigning entities.  As a result, unless otherwise indicated, use of the term "Plaintiff" and "RPI" herein shall also refer to each of the above-identified assigning entities.

B.   **Countrywide Defendants**

22.   Defendant Countrywide Financial Corporation ("Countrywide Financial" or "CFC") was, at all relevant times, a Delaware corporation with its principal executive offices located at 4500 Park Granada, Calabasas, California. Countrywide Financial was a holding company which, through its subsidiaries, engaged in mortgage lending, mortgage banking, banking and mortgage warehouse lending, dealing in securities and insurance underwriting throughout the United States. CFC operated through five business segments: Mortgage Banking, which originated, purchased, sold and serviced non-commercial mortgage loans nationwide; Banking, which took deposits and invested in mortgage loans and home equity lines of credit; Capital Markets, which operated an institutional broker-dealer that primarily specialized in trading and underwriting MBS; Insurance, which offered property, casualty, life and disability insurance as an underwriter and as an insurance agency; and Global Operations, which licensed and supported technology for mortgage lenders in the United Kingdom. As discussed below, CFC merged with and became part of Bank of America in 2008. Further, CFC appointed and controlled direct, wholly-owned subsidiaries, including but not limited to, Defendants CWALT, Inc. and CWABS, Inc. (the "Depositor Defendants"), as Depositors involved with the securities at issue. CFC's control included appointing CFC executives as directors and officers of

these entities.  For example, (i) Stanford L. Kurkland, former President and COO of CFC simultaneously served as CEO, President, and Chairman of the Board of Directors for the Depositor Defendants; (ii) Eric P. Sieracki, Executive Vice President and CFO of CFC from April 2005 until the Bank of America merger in July 2008, simultaneously served as an Vice President, CFO, Treasurer and member of the Board of Directors for the Depositor Defendants; (iii) David A. Spector simultaneously served as Senior Managing Director of Secondary Marketing of CFC and Vice President and member of the Board of Directors of the Depositor Defendants; (iv) N. Joshua Adler, a Countrywide Secondary Markets Managing Director, simultaneously served as President, CEO, and member of the Board of Directors for the Depositor Defendants; and (v) Jennifer S. Sandefur, Senior Managing Director and Treasurer of Countrywide Home simultaneously served as a member of the Board of Directors for the Depositor Defendants.   In addition, revenues flowing from the issuance and sale of the RMBS issued by the Depositor Defendants and the Issuing Trusts were passed through to CFC and consolidated into CFC's financial statements.  CFC, therefore, had power and influence and exercised actual day-to-day control over the Depositor Defendants, and authorized and caused the Depositor Defendants to make the misrepresentations and omissions set forth herein.

23.     Defendant Countrywide Home Loans, Inc. ("Countrywide Home" or "CHL"), a direct wholly owned subsidiary of CFC, is a New York corporation with its principal place of business in Calabasas, California.   Countrywide Home originates residential home mortgage loans.   Countrywide Home served as the "sponsor" and/or "seller" of the mortgage loans comprising the security for each of the Certificates purchased by Plaintiff's assignors, meaning that it played a central role in providing the pools of mortgage loans upon which the Certificates were based.  Countrywide Home was acquired by Bank of America on July 1, 2008, and is now doing business as Bank of America Home Loans, a division of Bank of America.

24.     Defendant Countrywide Home Loans Servicing LP ("Countrywide Servicing" or "CHLS"), a wholly owned subsidiary of Countrywide Capital Markets which is in turn a wholly-owned subsidiary of CFC, is a limited partnership organized under the laws of Texas with offices in Plano, Texas and Calabasas, California.  Countrywide Servicing services residential home mortgage loans.  Countrywide Servicing was acquired by Bank of America on July 1, 2008, after which it did business as BAC Home Loan Servicing, LP and subsequently merged with Bank of America, N.A. in or around July 2011.   Countrywide Servicing was the Master Servicer of every Certificate purchased by Plaintiff's assignors.

25.   Defendant Countrywide Securities Corporation ("Countrywide Securities" or "CSC"), a wholly owned subsidiary of CFC, is a California corporation with its principal place of business in Calabasas, California.   During times relevant to this Complaint, Countrywide Securities had an office in New York, New York.   Countrywide Securities is a registered broker-dealer and was an underwriter of the vast majority of the Certificates at issue.   Countrywide Securities was acquired by Bank of America on July 1, 2008.

26.   Defendant CWALT, Inc. ("CWALT") was, at times relevant to this Complaint, a Delaware corporation and a limited-purpose subsidiary of Countrywide Financial.   CWALT's principal executive offices were located at 4500 Park Granada, Calabasas, California.   CWALT served in the role of the "Depositor" in the securitization of the Issuing Trusts.   Defendant CFC structured Defendant CWALT as a limited purpose, wholly-owned finance subsidiary to facilitate its issuance and sale of the Certificates.   CWALT was controlled directly by CFC, including by the appointment of CFC executives as directors and officers of CWALT.   Revenues flowing from the issuance and sale of Certificates issued by CWALT were passed through to CFC and consolidated into CFC's financial statements.   Defendant CFC, therefore, had power and influence and exercised actual day-to-day control over CWALT, and authorized and caused CWALT to

make the misrepresentations and omissions set forth herein.  The security in this action for which CWALT served as Depositor is:

**TABLE 3**

| CUSIP | Security | Class | Nominal (Par) Value | Purchase Date |
|-------|----------|-------|---------------------|---------------|
| 12668PAE2 | CWALT 2006-OA17 | 1A2A | $30,000,000.00 | 9/29/2006 |

27.    Defendant CWABS, Inc. ("CWABS") was, at times relevant to this Complaint, a Delaware corporation and a limited-purpose subsidiary of Countrywide Financial.[3]  CWABS' principal executive offices were located at 4500 Park Granada, Calabasas, California.  CWABS served in the role of the "Depositor" in the securitization of the Issuing Trusts.  Defendant CFC structured Defendant CWABS as a limited purpose, wholly-owned finance subsidiary to facilitate its issuance and sale of the Certificates.  CWABS was controlled directly by CFC, including by the appointment of CFC executives as directors and officers of CWABS.  Revenues flowing from the issuance and sale of Certificates issued by CWABS were passed through to CFC and consolidated into CFC's financial statements.  Defendant CFC, therefore, had power and influence and exercised actual day-to-day control over CWABS, and authorized and caused CWABS to

---

[3] The Summons with Notice filed on September 28, 2012 mistakenly described Defendant CWALT, Inc., instead of Defendant CWABS, Inc., as the depositor for certain securities. Plaintiff realized this mistake after filing the Summons with Notice but prior to serving it on the Defendants.  Plaintiff subsequently effected good and timely service of the original Summons with Notice on all Defendants, including Defendant CWABS, Inc., in accordance with New York law, on or about January 18, 2013.

make the misrepresentations and omissions set forth herein.  The securities in this action for which CWABS served as Depositor are:

**TABLE 4**

| CUSIP | Security | Class | Nominal (Par) Value | Purchase Date |
|-------|----------|-------|---------------------|---------------|
| 23243WAC2 | CWL 2006-18 | 2A2 | $20,000,000.00 | 9/28/2006 |
| 23243WAD0 | CWL 2006-18 | 2A3 | $30,000,000.00 | 9/28/2006 |

28.    Defendants CWALT and CWABS are referred to herein as the "Depositor Defendants."  Each time the Depositor Defendants publicly offered and sold Certificates, they filed publicly-available prospectus supplements with the SEC.

29.    The Defendants identified in this Section II.B are hereinafter collectively referred to as the "Countrywide Defendants."

C.    **Bank of America Defendants**

30.    Defendant Bank of America Corp. ("Bank of America") is a Delaware corporation with its principal places of business in Charlotte, North Carolina and New York, New York.  On July 1, 2008, Countrywide Financial Corporation completed a merger with Red Oak Merger Corporation ("Red Oak"), a wholly owned subsidiary of Bank of America that was created for the sole purpose of facilitating the acquisition of Countrywide Financial and the assets of its subsidiaries, including the other Countrywide Defendants, pursuant to an Agreement and Plan of Merger, dated as of January 11, 2008.  As set forth in more

detail in Section VI, Bank of America is a successor-in-interest to the Countrywide Defendants and is thus vicariously liable for the conduct of the Countrywide Defendants alleged herein because, *inter alia*, most of Countrywide's assets and revenue-producing businesses were "sold" to Bank of America for insufficient consideration in a series of collusive, non-arm's-length dealings for far less than these assets were worth. Accordingly, the Bank of America Defendants remain liable as successors in interest to Countrywide under at least three separate and independent legal theories: actual fraudulent transfer, constructive fraudulent transfer and *de facto* merger.[4]

31. Defendant BAC Home Loans Servicing, LP was a Texas limited partnership and subsidiary of Bank of America with its principal offices at 4500 Park Granada, Calabasas, CA. BAC Home Loans Servicing, LP is identified in mortgage contracts and other legal documents as "BAC Home Loans Servicing, LP FNA Countrywide Home Loans Servicing, LP," meaning it was formerly known as Countrywide Home Loans Servicing, LP, the Countrywide subsidiary responsible for servicing Countrywide's mortgage loans after they were originated. BAC

---

[4] The federal court in the SEC Action against Mozilo and Sambol noted that "Countrywide's remaining operations and employees have been transferred to Bank of America, and Bank of America ceased using its Countrywide name in April 2009." *Securities and Exchange Commission v. Mozilo*, No. 09-CV-3994, 2010 WL 3656068, at *2 n.2 (C.D. Cal. Sept. 16, 2010).

Home Loans Servicing, LP has been merged into Bank of America, N.A. as of July 2, 2011.

32.     Defendant NB Holdings Corporation is a Delaware corporation with its principal place of business in Charlotte, North Carolina. NB Holdings Corporation is one of the shell entities used to effectuate the Bank of America-Countrywide merger. On July 3, 2008, Defendant Countrywide completed the sale of substantially all of its assets to NB Holdings Corporation, a wholly-owned subsidiary of Bank of America in a series of collusive, non-arm's-length transactions for far less than these assets were worth.   As set forth in more detail in Section VI, NB Holdings Corporation, together with Bank of America, is a successor-in-interest to Defendant Countrywide Home Loans.

33.     The Defendants identified in this Section II.C are hereinafter collectively referred to as the "Bank of America Defendants."

## JURISDICTION AND VENUE

34.     This action was originally filed in New York state court, which had subject matter jurisdiction over this action pursuant to Article VI, §7 of the New York State Constitution which authorizes it to serve as a court of "general [and] original jurisdiction in law and equity."   The amount in controversy exceeds the minimum threshold of $150,000 pursuant to §202.70(a) of the Uniform Civil Rules of the New York Supreme Court.

35.   New York state court also has personal jurisdiction over Defendants based on C.P.L.R. §§301 and 302 as each Defendant transacts business within the State of New York within the meaning of C.P.L.R. §302(a)(1), and each of them committed a tortious act inside the State of New York or outside the State of New York causing injury within the State of New York within the meaning of C.P.L.R. §§302(a)(2) and 302(a)(3).

36.   Defendants regularly and systematically transact business within the State of New York and derive substantial revenue from activities carried out in New York.  A majority of Defendants' acts pertaining to the securitization of the RMBS at issue giving rise to the causes of action alleged herein occurred in New York.  Each Defendant was actively involved in the creation, solicitation and or sale of the Certificates to Plaintiff's assignors from the State of New York. Specifically, Defendants prepared, underwrote, negotiated, securitized and marketed the offerings, and sold the Certificates to Plaintiff's assignors, in substantial part, from New York County, New York.

37.   Venue is proper in the New York state court pursuant to C.P.L.R. §503(c) because some Defendants maintain their principal place of business in New York County, and pursuant to C.P.L.R. §503(a) as designated by Plaintiff. Many of the alleged acts and transactions, including the preparation and

dissemination of the Offering Documents, also occurred in substantial part in New York County, New York.

38.   On January 20, 2013, Defendants removed this action to the United States District Court for the Southern District of New York, alleging that Court had subject matter jurisdiction since the action is allegedly "related to" a pending bankruptcy proceeding within the meaning of 28 U.S.C. § 1334.  Defendants also alleged that subject matter jurisdiction existed under the Edge Act, 12 U.S.C. § 632.  Plaintiff filed a motion for remand, which has since been withdrawn.

39.   On May 9, 2013, the Judicial Panel on Multidistrict Litigation transferred the action to this Court.

## BACKGROUND

**A.   The Shift in the Mortgage Lending Industry from "Originate to Hold" to "Originate to Distribute"**

### 1.   The Traditional Practice of "Originate to Hold"

40.   Until the recent past, mortgage lenders historically engaged in a practice that can be described as "originate to hold."  Lenders—or "originators"— would accept mortgage applications and collect relevant information from prospective borrowers who want to purchase property.  An originator would set and apply borrowing standards, evaluate a borrower's ability to repay a loan, and appraise the value of the property (or collateral) supporting the loan.  These so-

called "underwriting standards" are the guidelines or criteria an originator uses to ensure that loans are extended to borrowers who can repay them.

41.   If a borrower satisfied the originator's underwriting standards, then that borrower would be "approved" for a loan; if the borrower did not satisfy the originator's underwriting standards, then that borrower would be "rejected" for a loan.  If approved, the borrower would sign a promissory note obligating him or her to repay the principal of the loan with interest on a monthly basis over a term of years.   Simultaneously, the lender would record legal title to the home as security in case the homeowner became delinquent or defaulted on his or her payments.  Together the note and the security comprise the mortgage instrument.

42.   Originators would then retain or "hold" the loan on their balance sheet, meaning that the originator bore the risk of a borrower defaulting on the loan or being delinquent on the loan payments.  If the borrower defaulted and the originator had to foreclose, the originator had the right to do so by virtue of holding legal title to the property.  This risk of loss in the case of default—held on the books of the originator—thus provided a very strong incentive to implement and adhere to tough underwriting standards, *i.e.*, to make sure the borrowers could repay the loan and/or to make sure that the collateral for the loan could cover the loan amount if the borrower defaulted.   Further, the originator made sure it

followed the steps required to hold good title to the property in case it had to foreclose.

43.     In this "originate to hold" model, the loan originator would also "service" the loan, meaning the loan originator would collect the monthly interest and principal payments from the borrower.   Profits from extending loans to a borrower were a result of the difference, or spread, between the interest paid on deposits and the interest received by mortgage payments.

## 2.     The Massive Shift to "Originate to Distribute"

44.     Over time, the traditional practice of "originate to hold" began to give way to the practice of "originate to distribute."   In the 1980s and 1990s, Government Sponsored Entities ("GSEs")—the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation, and the Government National Mortgage Association—began "securitizing" loans purchased from private originators.  As discussed more fully in the following section, securitization is the process through which an institution (or set of institutions) bundles thousands of mortgages and issues securities that are backed, or supported, by those underlying mortgages.  A security backed by a pool of residential mortgages is known as a "residential mortgage backed security" ("RMBS").   The GSEs required originators to adhere to strict underwriting guidelines, which resulted in the RMBS receiving high credit ratings.  It was not until the 2000s that the private

RMBS market overshadowed the GSE market.  In a matter of years, the non-GSE securitization industry reached almost $1.5 trillion.

45.   This massive explosion of privately-generated RMBS created incredible demand in the marketplace for new loan originations.  Lenders began to "originate to distribute" in order to meet this demand.  One of the key consequences of this departure from "originate to hold" was that originators no longer had a strong incentive to maintain tough underwriting standards that focused on accurate assessments of borrower creditworthiness and accurate property appraisals.  This is because the originator no longer held the risk of loss on a given loan; the RMBS investor did—it was the RMBS investor who was entitled to the principal and interest payments from borrowers, but it was also the RMBS investor who bore the risk of loss in case of default.  In essence, the "originate to distribute" trend created a marketplace favorable to borrowers where lenders competed to originate more loans regardless of whether those loans were likely to be repaid.

46.   In the "originate to distribute" model, the originator's profit source changed.  The originator now made profits by earning, for example, "origination fees" and "servicing fees."  The more loans originated, the more fees collected— and because the originator no longer bore the risk of loss, tough underwriting standards reduced rather than enhanced profitability.  By weakening underwriting

standards, originators could greatly increase the number of "approved" loans, which would greatly increase the number of loans sold for securitization, which would greatly increase the fees earned.

47.     The "originate to distribute" mindset shaped not only the quantity of the mortgages originated, but the quality and structure of the loans themselves. Exotic products, like the Option Adjustable Rate Mortgage (the "Option ARM") loan, had fee structures that resulted in higher earnings than traditional payment plans.   Option ARM loans give the borrower a repayment plan option: the borrower typically chooses to pay as little as possible at the beginning of the loan only to experience a spike in the interest and principal after the expiration of the initial term.  This spike is sometimes called "payment shock" because the borrower is shocked by the substantially higher monthly payments.  The exotic loan products with high fees and payment shock phenomenon extended beyond Option ARM loans into other varieties of ARM loans that frequently featured very short initial terms.

48.     Countrywide altered the makeup of its origination portfolio—and its underwriting standards—to capitalize on the attractive fees associated with products like Option Arm loans and their accompanying payment-shock.  As the Financial Crisis Inquiry Report ("FCIC Report") detailed, "Countrywide's option ARM business peaked at $14.5 billion in originations in the second quarter of

2005, about 25% of all its loans originated that quarter.  But it had to relax underwriting standards to get there."[5]  As the Countrywide Defendants no longer bore the risk of loss on the loans, they had an incentive to relax underwriting standards to approve as many borrowers as possible.[6]

49.   As a result of the evolution from "originate to hold" to "originate to distribute," underwriting standards no longer drove the origination process—market demand for RMBS did.   Widespread abuses by the Countrywide Defendants followed.  Indeed, as discussed more fully elsewhere, Countrywide aggressively pursued the "originate to distribute" model, its essential, but

---

[5]  Financial Crisis Inquiry Commission, Financial Crisis Inquiry Report at 107 (citing Countrywide Loan Program Guide, dated March 7, 2005).

[6]  One popular variant of the Option ARM loan permits the borrower to make interest-only payments at a temporary or "teaser" fixed-interest rate.  The monthly payments at the teaser rate are lower than the long term indexed rate.  The spread between the teaser rate and the indexed rate compounds but need not be paid until the teaser rate expires.  Later, when the teaser rate expires, the interest is increased or "indexed" to a conventional rate characteristic of long-term mortgage loans.  The unpaid interest resulting from months of compounding spread is often large enough to trigger a reclassification of that interest as principal, a process called "negative amortization."  The increasing popularity of interest-only negative-amortizing adjustable-rate subprime mortgage loans was probative of the diminishing underwriting standards during the 2000s.  Often without producing much or any income documentation, borrowers could qualify for loans that required minimum payments lower than the rate at which the interest compounded. "The percentage of Countrywide's option ARMs that were negatively amortizing grew from just 1% in 2004 to 53% in 2005 and then to more than 90% by 2007... Declines in house prices added to borrowers' problems: any equity remaining after the negative amortization would simply be eroded.  Increasingly, borrowers would owe more on their mortgages than their homes were worth on the market, giving them an incentive to walk away from both home and mortgage." FCIC Report pg. 108 (citing Countrywide 2007 Form 10-K, p. F-45; 2005 Form 10-K, p. 57).

undisclosed, business strategy became "originating what was saleable in the secondary market."[7]

**B.    Countrywide Engaged in Every Stage of the Securitization Process**

50.    The Countrywide Defendants, directly and/or through their subsidiaries, were deeply involved as participants at every level of the securitization process.   As previously noted, "securitization" in the residential mortgage-backed loan arena is the process through which an institution issues financial instruments based on an underlying group of loans.   That particular species of financial instrument is an RMBS.  The Countrywide Defendants acted as originator, sponsor, seller, depositor, servicer, and/or underwriter in the various deals at issue.  In all securitizations at issue, Countrywide Defendants served in all of these roles, as outlined in the below Table.   Through this so-called "vertical integration," Countrywide controlled the entire securitization machine and had actual knowledge of the problems at each level of the transaction.  Because they were involved at every step of the process, the Countrywide Defendants had unique information that the mortgages they originated and securitized were inconsistent with the representations made to investors like Plaintiff.

---

[7] FCIC Report p. 105 (citing David Sambol interview by FCIC, September 27, 2010.)

**TABLE 5**

| Securitization | Seller / Sponsor | Depositor | Master Servicer | Underwriters |
|---|---|---|---|---|
| CWL 2006-18 | Countrywide Home | CWABS | Countrywide Servicing | Countrywide Securities; Bear, Stearns & Co. Inc.; Deutsche Bank Securities Inc. |
| CWALT 2006-OA17 | Countrywide Home | CWALT | Countrywide Servicing | Countrywide Securities |

51.     A step-by-step dissection of the securitization process demonstrates Countrywide's involvement at every level of that process.

52.     First, as discussed earlier, mortgage originators, like Defendant Countrywide Home, purportedly apply underwriting standards to approve or reject a loan.   Although each originator has its own underwriting guidelines, most originators rely upon several common criteria, including among other things, the borrower's income, debt, credit history, debt-to-income ratio, the value of the property securing the loan, and the LTV ratio (and, where relevant, CLTV ratio). All of this information is typically compiled and maintained in a loan file.  In each RMBS at issue, Countrywide Home originated all of the underlying loans or it combined loans it originated with loans it acquired from other mortgage originators.

53.     Second, in each instance, one of the Countrywide depositor entities[8] acquired a discrete inventory of mortgage loans from the "sponsor" (or "seller"),

---

[8]  Countrywide had four depositing entities: the Depositor Defendants (CWALT and CWABS) and two other similar entities, CWMBS, Inc. and CWHEQ, Inc.

COMPLAINT
CASE NO. 2:13-CV-3294 MRP (MANx)

Defendant Countrywide Home.  As sponsor, Countrywide Home then transferred those mortgages to the applicable depositor through written agreements, which generally contained written representations and warranties about the acquired mortgages ("Mortgage Acquisition Agreements").  The sponsor was generally responsible for pooling the mortgage loans to be securitized by the depositors (see below for description), negotiating the principal securitization transaction documents, and participating with the underwriters (see below for description) to structure the offerings.  The sponsor also made certain representations and warranties regarding the mortgages being securitized and the loan underwriting guidelines used in connection with the origination of such mortgages.

54.    Third, the applicable Countrywide depositor entity transferred (or deposited) the acquired pool of mortgage loans, along with their rights under the Mortgage Acquisition Agreement, to an "issuing trust."  In exchange, the applicable Countrywide depositor received certificates to be offered to various investors.  Furthermore, the applicable depositor was responsible for making sure title to the mortgage loans was properly and timely transferred and assigned to the trusts and/or trustees of the trusts.  The mortgages and their rights, among other things, constituted the corpus of the trusts.  The trusts—their corpus, trustees, and beneficiaries—were defined by a written pooling and servicing agreement ("PSA").  The trustee, depositor, and any parties obligated to monitor or service

the loans (*e.g.,* Defendant Countrywide Servicing) executed the PSA, which also contained representations and warranties about the underlying loans. The Certificates incorporated those representations and warranties.

55. Through this process of securitizing the loans in the issuing trust, the rights to the cash flows generated from the loans could be sold to various investors. The securitizations were structured to stratify the risk of loss among different levels, or "tranches," of investment. All of the tranches were part of the same offering, but each tranche involved a different level of risk, a different rate of return, and a different level and/or type of credit enhancement.[9] As such, different tranches received different ratings, and in some cases, different tranches referenced different loan pools within a securitization.

56. The depositor, technically an "issuer" under the U.S. securities laws, also filed "shelf" registrations with the SEC, which enabled the depositor to rapidly issue securities in "shelf take-downs." These "shelf" registration statements with the SEC can govern dozens of individual issuances of securities, or "shelf take-downs," that the depositor plans to conduct in the future. To market each

---

[9] Credit enhancement would often come in the form of so-called "internal" sources such as subordination (junior tranches exposed to losses before more senior tranches experienced losses), overcollateralization (the total value of the underlying collateral theoretically exceeded the total value of the issued Certificates) and excess interest (interest due on the loans exceeded interest payable to the Certificates). "External" credit enhancement could be supplied by, for example, the purchase of a surety bond, which acted as an insurance policy to protect against potential losses.

individual issuance, the depositor must file a "prospectus supplement" to the registration statement. While the registration statement and subsequent "base prospectuses" describe the program in general terms, each prospectus supplement and other Offering Documents describe in detail the particular securities (as well as their loan pools' specific characteristics and the specific underwriting guidelines purportedly applied to those loans) offered to investors at that time. In order to be offered through this method, it was required that the certificates be deemed "investment grade" quality by the credit rating agencies. If the Certificates were not investment grade, then they would need to go through the normal—and slow—process, which involved an SEC review prior to offering the Certificates for sale. To avoid that additional delay and expense, the Countrywide Defendants acted to ensure that the Certificates could be issued through shelf take-downs.

57.   At the point in the process where the mortgage loans and rights are securitized into Certificates, the sponsor, Countrywide Home provided the credit rating agencies with the information about the mortgage loan pools for each securitization. Given the critical need to achieve investment grade ratings to be eligible for a shelf take-down, Countrywide Home worked closely with the rating agencies to make sure that each tranche received the desired rating. Countrywide Home knew that the information it provided to the rating agencies materially misrepresented and omitted key facts about the quality of the mortgage loan pools,

and therefore Countrywide Home also knew that the ratings did not accurately reflect the credit risk of the RMBS.   The credit rating agencies analyze performance data on mortgage loans of every type and use that information to build models, which ultimately assign credit ratings to RMBS.   The models generate the "tranches" (with their associated credit enhancements and payment priorities) necessary to achieve investment grade ratings for the certificates that the trusts issue.

58.   As all of the securities at issue in this lawsuit were shelf take-downs from shelves the Countrywide Defendants created, their issuance never would have been possible without investment grade ratings from the credit rating agencies. That is one of the many reasons why the Countrywide Defendants made material misrepresentations and omissions to the Plaintiff and the credit rating agencies.   As Moody's representative Michael Kanef testified before the U.S. House of Representatives, "[r]egardless of the quantity of data we assess, if the data we receive is faulty—e.g., as a result of misrepresentation—the quality of our [resulting credit ratings] will be jeopardized."

59.   Next, the issuing trust—as holder of the mortgages and their associated rights, and pursuant to the terms of the PSA—issues the Certificates back to the applicable depositor, *e.g.*, CWALT or CWABS.   The applicable depositor then passed the Certificates to the underwriter or underwriters, such as

Defendant Countrywide Securities and/or other investment banks. The underwriter(s) sold the Certificates to investors like the Plaintiff. The terms of a particular underwriter's liabilities and obligations in connection with the purchase, sale, and distribution of RMBS certificates are usually articulated in a written agreement between the depositor and the underwriter (the "Underwriting Agreement"). Furthermore, it is a required industry practice for underwriters of RMBS offerings to perform an investigation of the loans backing the certificates to investigate the loans and to ensure that the quality of the loans is as represented in the offering documents provided to investors. Prospective investors like Plaintiff look to underwriters like Countrywide Securities (a fact known to the underwriter) to validate that the security is sound and that the offering documents are correct.

60.    Finally, the servicer, Defendant Countrywide Servicing, would collect borrower payments. These servicing rights were tremendously valuable. After collection by the servicer, the trustee—which agrees to administer the trust and to satisfy contractual and common law duties to trust beneficiaries—then distributed those payments to investors (as beneficiaries) in accordance with the terms of the offering.

61.    The collateral pool of loans for each securitization usually included thousands of loans. The underlying loan files were not provided or available to RMBS investors like the Plaintiff. Instead, the Countrywide Defendants—in their

various roles as originator, seller, sponsor, depositor, servicer, and underwriter of the securitization—were responsible for gathering, verifying, and presenting to potential investors, the SEC, and the credit rating agencies accurate and complete information about the credit quality and characteristics of the loans deposited into the trust. RMBS investors like Plaintiff thus had to rely on the Countrywide Defendants' representations about the mortgages underlying the RMBS and the process used to approve those loans.

62. Investors like Plaintiff purchased the certificates, and in so doing, provided the capital that compensates all of the securitization participants identified above. As such, Countrywide's "vertical integration" not only meant that Countrywide had actual knowledge of the problems at each level of the transaction, but also that Countrywide profited through fee generation at every step as well.

## FACTS RELEVANT TO PLAINTIFF'S CLAIMS

### A. Countrywide's Material Misrepresentations and Omissions

#### 1. Countrywide Misrepresented Its Stated Underwriting Guidelines

##### a. Countrywide Touted "Prudent Underwriting Standards" and Pledged "No Compromise" in Adhering to Them

63. By 2005, Countrywide was the largest mortgage lender in the United States, originating, selling and servicing prime and subprime/nonprime mortgage loans. Co-founded by Mozilo in 1969, Countrywide had, for much of its history,

originated mostly traditional long-term, fixed-rate, first-lien and fully documented mortgage loans to borrowers with prime credit quality. These loans, typically limited to no greater than $417,000 for a single-family residence, are known as "conforming loans" because they are eligible for sale to GSEs such as Federal National Mortgage Association ("Fannie Mae") and Federal Home Loan Mortgage Corporation ("Freddie Mac"). When properly underwritten and serviced, conforming loans historically have the lowest rates of delinquency and default and are considered the most conservative loans in the residential mortgage industry. Over 50% of the mortgage loans originated by Countrywide during 2001-2003 were conforming loans.

64. During a July 2003 conference call with industry analysts, Mozilo announced that the new goal of Countrywide was "to dominate the purchase market and get [Countrywide's] overall market share to the ultimate thirty percent by 2006-2007." Countrywide soon began offering a more diverse array of loan products in an effort to achieve that goal, including loans that did not meet the GSE guidelines, which are known in the industry as "non-conforming" loans. The percentage of non-conforming loans by Countrywide jumped from 24.9% in 2002 to 47.2% in 2005. In the same period, the percentage of prime conforming loans by Countrywide plummeted from 59.2% to 32.0%.

65.     The Countrywide Defendants took on this additional risk because they needed more and more loans to feed their securitization machine.  As discussed above, unlike a traditional bank, which often originates loans to hold in its portfolio, the Countrywide Defendants employed an "originate to distribute" model.  Most of the loans by the Countrywide Defendants were securitized and sold, earning the Countrywide Defendants a profit while at the same time removing risky assets from the Countrywide Defendants' books.

66.     To maximize those profits, the Countrywide Defendants continued to tout the high quality of their loans and strict adherence to underwriting guidelines to Plaintiff's assignors and other investors just as the Countrywide Defendants were approving riskier and riskier loans.  In fact, Countrywide's 2005 Form 10-K represented that Countrywide "ensure[d] our ongoing access to the secondary mortgage market by consistently producing quality mortgages," and asserted that "[w]e are focused on ensuring the quality of our mortgage loan production. ..."  And in each of its Annual Reports for 2005, 2006, and 2007, Countrywide represented that it had "establishe[d] standards for the determination of acceptable credit risks" and "manage[d] credit risk through credit policy, underwriting, quality control, and surveillance activities."   Among those standards, Countrywide claimed, were "proprietary underwriting systems ... that improve the consistency of underwriting standards, assess collateral adequacy, and help prevent fraud."

67.     Countrywide claimed that its disciplined adherence to prudent lending practices was "best-in-class," and made Countrywide a "role model" for responsible lending.  For example, as Mozilo explained at a September 2006 Fixed Income Investor Forum hosted by Countrywide: "[A]s an industry leader we served as a role model to others in terms of responsible lending.  We take seriously the role of a responsible lender for all of our constituencies. … To help protect our bond holder customers, we engage in prudent underwriting guidelines."  At the same forum, Sambol added: "[W]e have an intense and ongoing focus on share growth while at the same time maintaining a very strong internal control environment and what we believe is best-in-class governance. … [O]ur culture is also characterized by a very high degree of ethics and integrity in everything that we do."

68.     According to the Countrywide Defendants, these "prudent underwriting guidelines" were used in originating the mortgage loans underlying the Certificates purchased by Plaintiff's assignors.  The Prospectus Supplements for each of the Certificates represented, in sum or substance, that all or a portion of the underlying loans were originated or acquired in accordance with Countrywide's underwriting standards.  The Prospectus Supplements also emphasized that the primary evaluative metrics behind the underwriting guidelines

were the prospective borrower's repayment ability and the adequacy of the mortgaged property as collateral.

69.    The credit quality of the securitized loans materially affected Countrywide's ability to successfully and profitably market the Certificates to Plaintiff and other investors.   Because adherence to Countrywide's stated origination guidelines was material information to investors such as Plaintiff's assignors when evaluating the risks associated with the Certificates, the Countrywide Defendants made sure to assert, falsely, that there would be "no compromise" in their adherence to those guidelines throughout their frenzied expansion.   For example, in a January 2004 call with industry analysts, Mozilo stated "[g]oing for 30% market share here is totally unrelated to quality of the loans we go after … [t]here will be no compromise in that as we grow market share." Mozilo further represented that Countrywide would target safe borrowers to maintain the quality of its loans.   That pledge was repeated in a call with analysts on March 15, 2005, in with Mozilo stated "[y]our question is 30 percent, is that realistic. … [i]s it achievable?  Absolutely …. But I will say this to you, that under no circumstances will Countrywide ever sacrifice sound lending and margins for the sake of getting to that 30 percent market share."

70.    The Countrywide Defendants knew these representations about their underwriting guidelines and credit risk management were false when made.

Between 2005 and 2007, in an effort to quench the Countrywide Defendants' thirst for profits and market share, senior management, including Mozilo and Sambol, irrevocably latched the Countrywide Defendants to the securitization gravy train. Because growing profits through securitization necessarily required increasing loan origination, the Countrywide Defendants knowingly adopted, from the top down, a culture aimed at increasing loan volume regardless of material deviations from the stated underwriting guidelines.  Rather, the aim was to write as many loans as possible regardless of credit risk or even evidence of borrower fraud.  Contrary to its reassurances to Plaintiff's assignors and other investors that Countrywide was an industry "role model" for responsible lending that primarily originated and sold high-quality mortgages, internal emails, notes, testimony and other materials disclosed in the course of litigation filed by the Securities and Exchange Commission on June 4, 2009 ("SEC Action") demonstrate the Countrywide Defendants' wholesale abandonment of their stated underwriting guidelines through an unbridled use of "exceptions" to those guidelines.  As explained below, these and other materials show that the Countrywide Defendant's thirst for market share and profits allowed Countrywide's exceptions to become Countrywide's rule.

71.    While Countrywide disclosed the possibility that the loan pools underlying the Certificates could contain loans approved pursuant to exceptions to

the stated underwriting guidelines *if* "compensating factors" were found to exist, the Countrywide Defendants failed to disclose which underlying loans, if any, were approved on an exception basis. The Countrywide Defendants failed to identify what exceptions, if any, were used to approve any such underlying loans. And senior executives confirmed that the Countrywide Defendants even failed to disclose what percentage of the underlying loans, if any, for any particular loan product were approved on the basis of any exception. In fact, a Countrywide attorney who participated in preparing the Offering Documents, Paul Liu, testified in the SEC Action that the Prospectus Supplements failed to disclose the amount or percentage of loans underlying the relevant securitization that had been approved on an exception basis; rather, they merely hinted that exceptions "may be made" if compensating factors were present.

72.    Moreover, the Countrywide Defendants made other representations to assure investors that the level of any exceptions that "may be made" was low. According to testimony in the SEC Action from Christopher Brendler, an analyst who covered Countrywide beginning in January 2006, Countrywide repeatedly represented, both during investor calls and at investor forums, that its policy was to "keep our exceptions low." Brendler further testified that within the industry, a "low" exception rate would be between 5% to 10% of total loans. The Countrywide Defendants, however, knew that their exception rate was anything

- 49 -

but "low."  For example, contemporaneously with the Countrywide Defendants' public representations of "low" exception rates, a June 26, 2006 package for Countrywide's credit risk group reported that Countrywide had underwritten, on an exception basis, 44.3% of its Pay-Option ARMS, 37.3% of its subprime first liens, and 55.3% of its home equity loans.   And nearly a year before, Sieracki, McMurray and other senior executives attended a June 28, 2005 Credit Risk Committee presentation informing them that 40% of Countrywide's loan originations were nonconforming exception loans.   Despite Countrywide's repeated assurances of "low" exception rates, McMurray testified in the SEC action that Countrywide's "level of exceptions was higher" than he observed elsewhere.

> **b.**   **Countrywide Defendants Abandoned Stated Underwriting Guidelines in Favor of "Matching" or "Shadow" Guidelines**

73.   One widely used, but undisclosed, exception employed by the Countrywide Defendants was a focus of the SEC Action.  Beginning in early 2005, Countrywide adopted a policy that effectively allowed it to ignore its stated underwriting guidelines and instead "match" any product offered by its competitors regardless of risk.  Referred to internally as "shadow guidelines," this matching strategy as a practical matter resulted in the Countrywide Defendants' lending practices devolving into, according to its Chief Risk Officer John McMurray, the "most aggressive in the industry."